# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-21-00219-CV

---

**LMP Austin English Aire, LLC, derivatively through Lafayette English Partner, LLC, (individually and derivatively) through Lafayette English Apartments, LP, Appellants**

v.

**Lafayette English Apartments, LP (Nominal Defendant); Lafayette English GP, LLC; HVC English, LLC; HVC Lafayette, LLC; Scott Schaeffer; Austin Lafayette Landing Realty LLC; and Austin CMA English Aire Realty LLC, Appellees**

---

### FROM THE 459TH DISTRICT COURT OF TRAVIS COUNTY
### NO. D-1-GN-18-001682, HONORABLE DUSTIN M. HOWELL, JUDGE PRESIDING

---

## O P I N I O N

Appellants filed this appeal from a final take-nothing judgment in their suit against Appellees involving the 2015 sale of two southeast Austin apartment complexes (collectively, the Properties) in which Appellants owned an interest. For the reasons stated below, we will affirm the district court's judgment in part and reverse and remand in part.

**Summary of Underlying Suit**

In 2006, Lafayette English Apartments, LP financed its purchase of the Properties with a $17,300,000 loan from RAIT Partnership, LP that was secured by the Properties. Appellants owned interests in business entities that bought the Properties. In 2009, contending that the Properties were underperforming, the lender took control of the Properties, and the entities that owned the Properties were reorganized.

The Properties were sold in 2015, and in 2018, Appellants filed suit challenging the sale. They argued that the Properties were sold at an undervalued price, which deprived them of a distribution of the sale proceeds, and that the sale was improper and should be unwound because it occurred without the consent of a contractually required "Independent Manager." The Properties were sold again in 2018 after Appellants had filed suit.

In their suit, Appellants made derivative claims against: (1) the reorganized entities that owned the Properties (Lafayette English GP, LLC and Scott Schaeffer); (2) the parties who purchased the Properties in 2015 from the lender-controlled owners (HVC English, LLC and HVC Lafayette, LLC); and (3) the ultimate buyers and current owners of the Properties (Austin Lafayette Landing Realty LLC and Austin CMA English Aire Realty LLC). Appellants pleaded claims for breach of contract, breach of fiduciary duty, fraud by nondisclosure, "knowing participation/aiding and abetting breach of fiduciary duty," and violations of the Texas Uniform Fraudulent Transfer Act (TUFTA).[1] They sought relief in the form of a declaratory judgment, an accounting, and quieting of title.[2] Appellees responded with several motions, including a plea to the jurisdiction and motions to dismiss under the Texas Citizens Participation Act (TCPA)[3] and Texas Rule of Civil Procedure 91a.[4] The parties also filed cross-motions for summary judgment.

---

[1] *See generally* Tex. Bus. & Com. Code §§ 24.001-.05.

[2] Appellants did not plead every claim against every Appellee.

[3] *See generally* Tex. Civ. Prac. & Rem. Code §§ 27.001-.011.

[4] The district court's orders denying the Rule 91a motion and awarding fees to Appellants are not at issue in this appeal.

After hearing the motions, the district court signed a series of interlocutory orders: (1) granting Appellees' plea to the jurisdiction as to Appellants' TUFTA claims; (2) granting a partial motion to dismiss under the TCPA as to Appellants' claim for "knowing participation/aiding and abetting breach of fiduciary duty"; (3) assessing $50,651.82 in attorney's fees and $50,203.00 in sanctions against Appellants under the TCPA; (4) overruling all parties' objections to the summary-judgment evidence; and (5) granting Appellees summary judgment as to Appellants' remaining claims and denying Appellants' cross-motion for summary judgment. The orders dismissing Appellants' claims and the associated orders awarding attorney's fees and sanctions to Appellees were memorialized in the district court's May 4, 2021 final judgment.

**Appellate Issues**

Appellants present multiple issues challenging the final judgment and the subsumed orders. They challenge the order granting the plea to the jurisdiction, asserting that they have standing to bring a TUFTA claim. They challenge the order granting the TCPA motion, contending that the statute is inapplicable to a claim for "knowing participation/aiding and abetting breach of fiduciary duty" in a private business transaction and alternatively, that they presented clear-and-specific evidence to defeat the TCPA motion. Relatedly, they argue that the TCPA attorney's fees award was made without evaluating whether the fees were "reasonably necessary" and that the TCPA sanctions award was "excessive and impermissibly punitive." Lastly, Appellants challenge the district court's evidentiary rulings and order granting Appellees summary judgment as to Appellants' breach-of-contract claim, their claims against the general partner that were not the subject of a summary-judgment motion, their request for

3

declaratory judgment that the property-sale documents were void for lack of consent by an Independent Manager, and their quiet-title claim premised on the void sale of the property.

## BACKGROUND

The number of entities in this case and the similarity of some of their names complicates discussion of the complex background. The relevant corporate structure is:



Using this corporate structure, we will refer to the entities as:

- Original Partnership (Appellant and Appellee Nominal Defendant Lafayette English Apartments, LP),

- General Partner (Appellee Lafayette English GP, LLC),

- Limited Partner (Appellant Lafayette English Partner, LLC),

- Subsidiary General Partner (Nonparty Lafayette English Member, LLC), and

- Subsidiary Limited Partner (Appellant LMP Austin English Aire, LLC).

4

We will refer to the buyers as:

- First Buyers (Appellees HVC English, LLC and HVC Lafayette, LLC), and

- Second Buyers (Appellees Austin Lafayette Landing Realty LLC and Austin CMA English Aire Realty LLC).

**Purchase of Properties by Ownership Entities in 2006**

Richard Nathan is a real-estate investor from Los Angeles who acquired the Properties in 2006. He set up the ownership entities and handled the organization. Lee Minshull (who had had prior dealings with Nathan) along with his brother Paul Minshull, and two others, William Johnson and Balazs Czaki, formed a limited liability company, LMP Austin English Aire, LLC (Subsidiary Limited Partner), to invest in the Properties.

Lafayette English Apartments, LP (Original Partnership) is a Texas limited partnership created to own and manage the Properties. Upon its creation, Original Partnership consisted of a general partner, NCV Austin General, LLC (NCV), a Delaware limited liability company, and a limited partner, Lafayette English Partner, LLC (Limited Partner), a Delaware limited liability company. Limited Partner and NCV each had its own LLC agreement, and Nathan was president of both. NCV had a 0.5% general partnership interest in Original Partnership, while Limited Partner had a 99.5% limited partnership interest. LMP Austin English Aire, LLC (Subsidiary Limited Partner) owned a 46.5% limited partnership interest in Limited Partner.

As we will discuss further, Original Partnership's "Agreement of Limited Partnership of Lafayette English Apartments, LP" (the 2006 Original Partnership Agreement) included provisions designed to make it a "special purpose entity." The 2006 Original Partnership Agreement also included a requirement that the general partner, NCV, have someone

5

serve as an "Independent Manager" for Original Partnership and obtain the Independent Manager's written consent before taking any "Material Action," including sale of "all or substantially all of the assets of the Company."

Original Partnership bought the Properties by obtaining $17,300,000 in first-lien financing from RAIT. The financing involved a nonrecourse loan that required interest-only payments until its maturity date three years later, in 2009. Original Partnership's partners, Limited Partner and NCV, each entered into pledge and security agreements with RAIT that pledged their respective interests in Original Partnership as collateral for the loan. Under the provisions of these pledge and security agreements, any default authorized RAIT to "transfer and register in its or its nominee's name the whole or any part of the Collateral"—i.e., Limited Partner's and NCV's interests in Original Partnership—and to "act with respect to the Collateral or the Proceeds as though Lender were the outright owner thereof." These provisions were included as an alternative to judicial foreclosure. As John Reyle, General Counsel for RAIT Financial Trust, explained in his deposition, it is "quicker and easier for a lender to seize the ownership entity than to seize the property itself."

According to Scott Schaeffer, President and Chief Executive Officer of RAIT Financial Trust, the Properties "never performed well."[5] Schaeffer clarified in his deposition that "never performed well," meant that "expenses [we]re high and growing faster than the rents." Appellants dispute that the Properties underperformed.

---

[5] Scott Schaeffer was president of RAIT Financial Trust from 2000 to 2016, CEO from 2009 to 2016, and a director of RAIT General, Inc., the general partner of RAIT Financial Trust. John Reyle succeeded Schaeffer as CEO of RAIT Financial Trust, a mortgage real estate investment trust (REIT). RAIT Financial Trust's subsidiary, RAIT Partnership, LP, was the original lender on the $17,300,000 loan.

6

**Reorganization of Entities in 2009 and Loan Increase in 2010**

After maturity of the loan in 2009, and one year into the recession that began the year before, RAIT took over the Properties without a judicial foreclosure. Schaeffer explained that RAIT "took the property back because the property didn't perform either at maturity or during its term paying its interest." As part of this process, the entities were reorganized. After the reorganization, RAIT controlled the management of the entities and Lafayette English GP (General Partner) replaced NCV as general partner of Original Partnership. Both General Partner and Limited Partner of Original Partnership amended their organizational documents, substituting RAIT-affiliated employees as Original Partnership's partners and officers. Schaeffer was president of all the reorganized entities, except Limited Partner. After the 2009 reorganization, the RAIT-affiliated entities stepped into Nathan's shoes and owned the entirety of General Partner of Original Partnership and 53.5% of Limited Partner of Original Partnership.

### 1. 2009 Original Partnership Agreement

To effectuate the reorganization, Original Partnership executed a "First Amendment to Agreement of Limited Partnership of Lafayette English Apartments, LP" (2009 Original Partnership Agreement). Under the 2009 Original Partnership Agreement: (1) NCV withdrew from the partnership and assigned all its interest to General Partner; (2) Nathan withdrew from Original Partnership; and (3) Schaeffer became president of both General Partner and Limited Partner. After the reorganization, as reflected in the chart above, the ownership interests in Original Partnership were split between General Partner, which had a 0.5% general partnership interest, and Limited Partner, which owned a 99.5% limited partnership interest. Limited Partner, in turn, is owned by Subsidiary Limited Partner (LMP Austin English Aire, LLC) and Subsidiary General Partner (Lafayette English Member, LLC), which hold 46.5% and

53.5% interests respectively in Limited Partner. Notably, the 2009 Original Partnership Agreement does not specifically require appointment of an Independent Manager as the 2006 Original Partnership Agreement did. Appellants contend that the Independent Manager requirement carried forward, pointing to a paragraph stating that "except as modified hereby" the 2006 Original Partnership Agreement "shall continue in full force and effect in accordance with its terms."

### 2. 2009 General Partner Agreement

Original Partnership's 2009 Original Partnership Agreement contemplated a new LLC agreement for NCV's replacement, General Partner. The new agreement, "Limited Liability Company Agreement of Lafayette English GP, LLC" (2009 General Partner Agreement), was drafted and approved by General Partner and its sole member, Subsidiary General Partner. This 2009 General Partner Agreement deleted a provision requiring appointment of an Independent Manager that had been in NCV's 2006 LLC agreement. Although this 2009 General Partner Agreement was unsigned, Appellees point out that under the law in Delaware—where General Partner was created and registered as an LLC—LLC agreements are not subject to any statute of frauds and are binding on LLCs regardless of whether the LLC agreement is executed. *See* Del. Code Ann. tit. 6, § 18-101-(9). The district court overruled Appellants' evidentiary objections to the admissibility and authenticity of this 2009 General Partner Agreement and to the testimony from a corporate representative about this agreement. Appellants challenge those evidentiary rulings here.

### 3. 2009 Limited Partner Agreement

Original Partnership's Limited Partner amended its LLC agreement as part of the 2009 reorganization. The new agreement, "Amended and Restated Limited Liability Company

Agreement of Lafayette English Partner, LLC," (2009 Limited Partner Agreement) specified that the interests in Limited Partner were split between Subsidiary General Partner, which had a 53.5% interest, and Subsidiary Limited Partner, which had a 46.5% interest. The 2009 Limited Partner Agreement also specified that Subsidiary General Partner would be the manager of Limited Partner, including its business and affairs as the sole limited partner of Original Partnership. The 2009 Limited Partner Agreement required General Partner to make capital distributions to Subsidiary General Partner and Subsidiary Limited Partner under certain circumstances, including the sale of the Properties by Original Partnership. Thus, in the event of such sale, Limited Partner had to distribute 53.5% of any net proceeds to Subsidiary General Partner and 46.5% of any net proceeds to Subsidiary Limited Partner. The 2009 Limited Partner Agreement was signed by Schaeffer for Subsidiary General Partner (manager of Limited Partner) and Lee Minshull for Subsidiary Limited Partner. As a result of the 2009 reorganization, Lee Minshull was relieved of his $17.3 million obligation as guarantor for the investment.

### 4. 2009 Sharing and Release Agreement

Also in 2009, Nathan (as president of the withdrawing general partner NCV) and Lee Minshull (as manager of Subsidiary Limited Partner) signed a "Sharing and Release Agreement." Under this agreement, the parties acknowledged that NCV had assigned all its interest in Original Partnership to affiliates of the lender, RAIT. Further, this agreement stated that NCV and Subsidiary Limited Partner released one another from claims concerning the investment and that Subsidiary Limited Partner would share with NCV any future distributions that Subsidiary Limited Partner might receive from its membership interest in Limited Partner.

In 2010, Original Partnership (as Borrower) and RAIT CRE CDO I, Ltd. (as Lender) signed a "Third Amendment to Loan and Security Agreement and Omnibus Amendment

9

to Other Loan Documents" (Third Amended Loan).[6] Under the Third Amended Loan, Original Partnership requested—and RAIT CRE CDO I, Ltd. agreed to provide—an advance of $700,000 to fund capital improvements on the Properties. This $700,000 capital-improvements advance increased the principal balance of Original Partnership's loan to $18 million.

**Sale of Properties to First Buyers in 2015**

In 2015, Schaeffer called Howard Treatman, a manager of First Buyers (HVC English, LLC and HVC Lafayette, LLC), offering the opportunity to purchase some real-estate owned (REO) assets, including the Properties. Treatman explained in his deposition that REO is an industry term for property that is "Real Estate Owned by a lender that basically they've had to take back" after some default by the borrower. Original Partnership and First Buyers entered into an Agreement of Purchase and Sale to convey the Properties for $18,786,500. Attorneys from the firm of Ledgewood, P.C. in Pennsylvania represented both parties in the 2015 Sale.

Treatman signed the Purchase and Sale Agreement for the First Buyers and Scott Davidson, president of RAIT General, Inc., signed for Original Partnership. The sale price consisted of First Buyers' assumption of approximately $18 million in debt for the Properties, plus outstanding accrued interest of $786,500. Given the purchase price and the existing debt on the Properties, there were no net proceeds from the sale to distribute. Fifteen months after the closing, Csaki, a member of Subsidiary Limited Partner, requested a copy of Subsidiary Limited Partner's K-1 form from a tax manager at RAIT Financial and learned that the Properties were sold in 2015.

---

[6] Appellants pleaded that RAIT Partnership, LP assigned the loan to RAIT Preferred Holdings I, LLC, which then assigned the loan to RAIT CRE CDO I, Ltd.

10

Appellants contend that the 2015 Sale to First Buyers was void because Original Partnership lacked authority to sell the Properties without prior written consent of an Independent Manager, which was not obtained. Relying on a report from their expert, Paul Hornsby, Appellants also contend that the Properties were sold for less than their fair market value of $29,700,000.

Conversely, Appellees contend that no consent from an Independent Manager was necessary for the sale after the 2009 reorganization of the owner entities, and Appellees' expert Robert Radebaugh issued a report disputing Hornsby's conclusions as to the value of the Properties. Appellees further contend that the Properties' sale price covered the outstanding loan obligation of over $18 million and allowed the owner entities "to cut their losses and find a third party to take over the operating deficits and debt service." Appellees state that the Properties continued underperforming after being transferred to RAIT in 2009, requiring further credit extensions. Additionally, Appellees note that Matt Harker, RAIT's asset manager for the Properties, confirmed in his deposition that the Properties were experiencing a negative cash flow in the time period preceding the sale.

**Suit Filed and Properties Sold to Second Buyers in 2018**

In 2018, Subsidiary Limited Partner demanded that Limited Partner investigate and file suit concerning the 2015 Sale. Limited Partner declined. On April 6, 2018, Subsidiary Limited Partner filed its derivative suit against Original Partnership, General Partner, Schaeffer, and First Buyers, alleging that the 2015 Sale to First Buyers undervalued Original Partnership's only assets and was fraudulent.

Months after Subsidiary Limited Partner filed suit, First Buyers sold the Properties to Second Buyers (Austin Lafayette Landing Realty LLC and Austin CMA English Aire Realty LLC) for $38,450,000. Appellees contend that this 2018 sale price reflects First Buyers' investment in, and improvement to, the Properties in the years after they bought them. Appellees also note that Radebaugh attributed "major increases in property values in this area" to Oracle's December 2015 announcement that it would locate a corporate campus nearby.

After the 2018 Sale, Appellants amended their pleadings to bring a quiet-title claim against Second Buyers. In sum, Appellants contend that the 2018 Sale to Second Buyers is void and must be unwound because the 2015 Sale to First Buyers is void.

The litigation proceeded, and the parties filed their respective motions. The district court convened hearings on the motions and then issued the rulings at issue in this appeal.

## DISCUSSION

Appellants challenge the district court's final judgment and subsumed orders in multiple appellate issues. We address the issues in three groups, as they pertain to the orders issued on the plea to the jurisdiction, the TCPA motion, and the summary-judgment motions.

## I. Plea to the Jurisdiction

### A. TUFTA Claims Against First Buyers

Appellants contend that the district court erred by sustaining a plea to the jurisdiction that dismissed with prejudice their TUFTA causes of action against First Buyers (HVC English, LLC and HVC Lafayette, LLC), alleging the intentionally fraudulent transfer

and/or constructively fraudulent transfer of the Properties.[7] *See* Tex. Bus. & Com. Code § 24.005(a)(1), (2). Appellants' allegations included that Original Partnership sold the Properties (its only assets) in 2015 to First Buyers for a "drastically undervalued price," resulting in no net proceeds for Limited Partner to distribute; that the sale of the Properties was without notice to Subsidiary Limited Partner and was not an arms-length transaction between Original Partnership and First Buyers; and that Appellants were creditors with claims "that arose before or within a reasonable time after the Sale of the Properties as a result of the breach of the [2006 Original Partnership Agreement and 2009 Original Partnership Agreement]." In the plea to the jurisdiction, First Buyers argued that Appellants could not meet the threshold standing requirement to bring the statutory TUFTA claims against them as purchasers of the Properties because Appellants are not "creditors" of Original Partnership, the entity that sold the Properties.

### B. Standard of Review

"Courts lack subject-matter jurisdiction to adjudicate disputes initiated by parties lacking standing." *Vernco Constr., Inc. v. Nelson*, 460 S.W.3d 145, 149 (Tex. 2015). A claimant's lack of standing may be challenged through a plea to the jurisdiction. *Sneed v. Webre*, 465 S.W.3d 169, 180 (Tex. 2015). To show standing, a plaintiff has the burden of alleging facts that affirmatively demonstrate the court's jurisdiction to hear the cause. *Texas Ass'n of Bus. v. Texas Air Control Bd.*, 852 S.W.2d 440, 446 (Tex. 1993); *Suarez v. Silvas*, No. 04-21-00113-CV, 2022 Tex. App. LEXIS 992, at *10-11 (Tex. App.—San Antonio Feb. 9, 2022, no pet.) (mem. op.) (noting that plaintiff has burden to affirmatively demonstrate trial court's jurisdiction, which includes standing).

---

[7] The district court also denied Appellants' motion to reconsider the ruling on the plea to the jurisdiction.

13

"We review a trial court's ruling on a plea to the jurisdiction de novo." *In re Diocese of Lubbock*, 624 S.W.3d 506, 512 (Tex. 2021) (orig. proceeding). In determining whether a plaintiff has affirmatively demonstrated the trial court's jurisdiction to hear a case, we consider the facts alleged in the petition along with any evidence necessary to resolve the jurisdictional issues raised. *See Texas Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 226-27 (Tex. 2004); *Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 555 (Tex. 2000). If the plaintiff meets its burden of affirmatively demonstrating the court's jurisdiction to hear the cause, the plea to the jurisdiction should be denied. *Diocese of Lubbock*, 624 S.W.3d at 512. But if the pleadings affirmatively negate jurisdiction, the plea should be granted without affording the plaintiff an opportunity to replead. *Id.*

### C. Statutory Construction of "Creditor" Under TUFTA

TUFTA provides a comprehensive statutory scheme through which a creditor may seek recourse for a fraudulent transfer of assets or property. *Renate Nixdorf GmbH & Co. KG v. TRA Midland Props., LLC*, No. 05-17-00577-CV, 2019 Tex. App. LEXIS 26, at *10 (Tex. App.—Dallas Jan. 3, 2019, pet. denied) (mem. op.). "TUFTA is 'designed to protect creditors from being defrauded or left without recourse due to the actions of unscrupulous debtors.'" *Janvey v. GMAG, L.L.C.*, 592 S.W.3d 125, 126 (Tex. 2019) (quoting *KCM Fin. LLC v. Bradshaw*, 457 S.W.3d 70, 89 (Tex. 2015)). TUFTA aims "to prevent debtors from prejudicing creditors by improperly moving assets beyond their reach." *Id.* at 129.

When, as here, standing to bring a claim is statutorily conferred, the statute itself serves as the proper framework for a standing analysis, rather than common-law rules. *City of Dall. v. East Vill. Ass'n*, 480 S.W.3d 37, 43 (Tex. App.—Dallas 2015, pet. denied). "To have

14

standing to bring a cause of action for fraudulent transfer, a plaintiff must allege it is a 'creditor' with a 'claim' against a 'debtor,' that there was a fraudulent transfer of property by the debtor, and the plaintiff seeks relief concerning the fraudulently transferred property." *Renate Nixdorf GmbH v. Midland Inv'rs, LLC*, No. 05-14-01258-CV, 2016 Tex. App. LEXIS 4508, at *12-14 (Tex. App.—Dallas Apr. 28, 2016, pet. dism'd) (mem. op. on reh'g). Under TUFTA, a "creditor" is "a person . . . who has a claim," and a "debtor" is "a person who is liable on a claim." Tex. Bus. & Com. Code § 24.002(4), (6). "Debt" is defined as "liability on a claim." *Id.* § 24.002(5). "Claim," in turn, is defined as "a right to payment or property, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." *Id.* § 24.002(3).

"Our primary objective in construing a statute is to ascertain and effectuate the Legislature's intent without unduly restricting or expanding the statute's scope." *Janvey v. Golf Channel, Inc.*, 487 S.W.3d 560, 572 (Tex. 2016). We derive intent from the plain meaning of the text construed in light of the whole statute. *Id.* A statute's terms bear their ordinary meaning unless (1) the Legislature has supplied a different meaning by definition, (2) a different meaning is apparent from the context, or (3) applying the plain meaning would lead to absurd results. *Id.* "TUFTA further directs that it be 'applied and construed to effectuate its general purpose to make uniform the law with respect to [fraudulent transfers] among states enacting [the Uniform Fraudulent Transfer Act (UFTA)].'" *Id.* (quoting Tex. Bus. & Com. Code § 24.012). We may also consider the construction of pertinent terms in cases applying the UFTA by courts in states that have enacted the UFTA. *See Janvey*, 487 S.W.3d at 572-73. As we discuss further, courts uniformly treat statutory "creditor" status under TUFTA as a question of standing.

15

### 1. Standing as TUFTA "creditor"

Here, Appellants seek reversal of the district court's order sustaining the First Buyers' plea to the jurisdiction and contend that the plea "is defective" because a challenge to TUFTA creditor status is an issue of capacity—a non-jurisdictional question—rather than standing. However, Appellants' cited authorities for this proposition do not support it. *See Pike v. Texas EMC Mgmt., LLC*, 610 S.W.3d 763 (Tex. 2020); *see also Cooke v. Karlseng*, 615 S.W.3d 911 (Tex. 2021); *Lipshy v. Burk*, No. 05-19-00493-CV, 2020 Tex. App. LEXIS 8840 (Tex. App.—Dallas Nov. 12, 2020, no pet.) (mem. op.); *Mosaic Baybrook One LP v. Cessor*, Nos. 14-19-00514-CV, 14-19-00695-CV, 2021 Tex. App. LEXIS 5164 (Tex. App.—Houston [14th Dist.] June 29, 2021, pet. filed) (mem. op.). Significantly, *Pike v. Texas EMC Mgmt.* and the cited cases that follow it are inapplicable here because they do not involve TUFTA claims and do not address statutory "creditor" status. *See* 610 S.W.3d 763; *see also Cooke*, 615 S.W.3d at 912; *Lipshy*, 2020 Tex. App. LEXIS 8840, at *1. We determine a party's status as a TUFTA "creditor" by adhering to the statutory definition of that term. *See Youngkin v. Hines*, 546 S.W.3d 675, 680 (Tex. 2018) ("Courts must adhere to legislative definitions of terms when they are supplied."); *see also* Tex. Gov't Code § 311.011(b) ("Words and phrases that have acquired a technical or particular meaning, whether by legislative definition or otherwise, shall be construed accordingly.").

Appellants' reliance on *Mosaic Baybrook* is similarly misplaced. It involved the question of whether parties who were "personally aggrieved" and had standing to bring their individual TUFTA claims also had the capacity to bring TUFTA claims on behalf of others in a class "without first seeking new class-certification for the TUFTA claims." *Mosaic Baybrook*

16

*One*, 2021 Tex. App. LEXIS 5164, at \*23-24.  But there is no issue here involving class claims or whether any party could properly represent a class of others.

Next, Appellants cite a recent "holding" that a plaintiff—who controlled a trust that was an 80% limited partner in a limited partnership—qualified as a TUFTA creditor:

> Cohen qualifies as a creditor for purposes of this claim because a trust that he controlled had an ownership interest in the A&D partnership and a right to payment when [the general partner] Dilick sold A&D's sole asset and then derived millions of dollars in profits when he, [a person who controlled the purchaser entity], and [the purchaser entity] refinanced that asset.  *See* Tex. Bus. & Comm. Code § 24.002(2)-(6).

*In re Alabama & Dunlavy, Ltd.*, 983 F.3d 766, 774 (5th Cir. 2020).  This sentence is the extent of the case's discussion about creditor status.  *See id.*  It is unclear whether the parties presented the appellate court with any issue about the plaintiff's standing as a creditor under TUFTA.  Thus, we disagree with Appellants' assertion that the Fifth Circuit's "holding" in the case was "that a limited partner was a TUFTA creditor and could pursue improper sales of partnership assets."  And even if that were the case's holding, we would not be bound by it: "While Texas courts may certainly draw upon the precedents of the Fifth Circuit, or any other federal or state court, in determining the appropriate federal rule of decision, they are *obligated* to follow only higher Texas courts and the United States Supreme Court."  *Penrod Drilling Corp. v. Williams*, 868 S.W.2d 294, 296 (Tex. 1993).  Appellants have not shown that a challenge to TUFTA creditor status is a non-jurisdictional issue.  Accordingly, we disagree with their contentions that the district court "improperly sustained" a "defective" plea to the jurisdiction as to Appellants' TUFTA claims and the necessity of establishing statutory "creditor" status.

17

## 2. Equity interest holders in limited partnership are not its creditors

In response to Appellants' pleading of "creditor" status, First Buyers refer to a provision in the 2006 Original Partnership Agreement expressly disclaiming creditor status: "No Partner shall have any interest in any specific assets of the Partnership, and no Partner shall have the status of a creditor with respect to any distribution pursuant to Section 16 [discussing distributions to partners]." Thus, as First Buyers note, it is undisputed that Limited Partner, in which Subsidiary Limited Partner had a 46.5% interest, owns equity interest—not debt—in Original Partnership. Relying on the construction of the UFTA by other courts, First Buyers contend that being a holder of an equity interest in a limited partnership is inconsistent with being a "creditor" in the context of statutory fraudulent transfer claims. We agree.

First Buyers point to the customary distinction between equity interests and debt, as referenced by a Pennsylvania federal district court: "[I]t is well-established that a limited partnership interest constitutes an equity security. In turn, courts within the Third Circuit have consistently held that equity interests are not 'debt' within the meaning of PUFTA [Pennsylvania Uniform Fraudulent Transfer Act] or the Bankruptcy Code's analogous fraudulent transfer provision." *United States v. Rocky Mountain Holdings, Inc.*, 782 F. Supp. 2d 106, 122 (E.D. Pa. 2011) (internal citation omitted); *see* 11 U.S.C. § 548. That court also distinguished the fixed nature of creditors' claims from the variable distributions to partners: "It is widely held that true creditors 'hold claims regardless of the performance of the partnership business,' whereas payment of partnership distributions are 'subject to [] profits or losses.'" *Id.* (quoting *In re Riverside-Linden Inv. Co.*, 925 F.2d 320, 323 (9th Cir. 1991)). First Buyers also cite as persuasive authority the Ninth Circuit's conclusions that "[a] partnership interest is not a claim"

18

and that "if partnership interests are not 'claims,' then the holders of those interests are not 'creditors.'" *In re Riverside-Linden Inv. Co.*, 925 F.2d at 323.

State courts have similarly rejected the notion that holders of equity interests or investments have "creditor" status under the Uniform Fraudulent Transfer Act. One court determined, as part of its constructive-fraud analysis under the Arizona UFTA, that an "interest in a partnership is not a debt of the partnership." *Hullett v. Cousin*, 63 P.3d 1029, 1035-36 (Ariz. 2003). Another court recognized, when applying the Hawaii UFTA, that "the return of a capital contribution to or for the benefit of an investor is <u>not</u> the same as the repayment of indebtedness to a creditor." *Schmidt v. HSC, Inc.*, 358 P.3d 727, 737-739 (Haw. Ct. App. 2015), *cert. denied*, 2015 Haw. LEXIS 330 (Haw. Dec. 9, 2015). And another court concluded that: "Equity investments neither trigger a right to payment nor transform capitalists into creditors. Consequently, [plaintiff's] alleged equity interest in [a business entity] does not constitute a claim for the purposes of the UFTA, and [he] cannot claim creditor status on its account." *Maloney v. Alliance Dev. Grp., LLC*, No. 06 CVS 6776, 2006 NCBC LEXIS 14, at *20 (N.C. Super. Ct. Sept. 18, 2006).

Debt holders, by contrast, have been afforded statutory "creditor" status under TUFTA. *See, e.g.*, *Cohen v. NewBiss Prop., L.P.*, No. 01-19-00397-CV, 2020 Tex. App. LEXIS 9190, at *26 (Tex. App.—Houston [1st Dist.] Nov. 24, 2020, pet. denied) (mem. op.) (addressing issue of plaintiff's standing to pursue TUFTA claim against purchasers as TUFTA "creditor" after settlement and dismissal of plaintiff's underlying claim against debtor); *Midland Inv'rs*, 2016 Tex. App. LEXIS 4508, at *14-15 (concluding that plaintiffs had standing to seek TUFTA relief against Brauss defendants because plaintiffs "showed they had a claim, their judgment against the Brausses, that they were creditors of the Brausses and the Brausses were their

19

debtors, and that the Brausses made a fraudulent transfer"); *Parham Fam. Ltd. P'ship v. Morgan*, 434 S.W.3d 774, 785 (Tex. App.—Houston [14th Dist.] 2014, no pet.) (concluding that judgment creditor of debtor had standing to bring TUFTA claim challenging sale of debtor's property); *Essex Crane Rental Corp. v. Carter*, 371 S.W.3d 366, 386-87 (Tex. App.—Houston [1st Dist.] 2012, pet. denied) (concluding that creditor with judgment lien against debtor's property had standing to sue transferee under TUFTA after property was sold and lien was extinguished).

On this record, we conclude that Subsidiary Limited Partner's partnership interest in Original Partnership, as the 46.5% interest holder in Limited Partner, is an equity interest that does not constitute a "debt" or a "claim" as those terms are defined in TUFTA. *See* Tex. Bus. & Com. Code § 24.002(3), (5); *accord In re Riverside-Linden Inv.*, 925 F.2d at 323; *Rocky Mountain Holdings*, 782 F. Supp. 2d at 122; *Maloney*, 2006 NCBC LEXIS 14, at *20. Moreover, because TUFTA defines a "creditor" as "a person . . . who has a claim," the lack of a "claim" defeats Appellants' pleaded status as a "creditor." *See* Tex. Bus. & Com. Code § 24.002(4). Finally, because Appellants are not statutory "creditors" of Original Partnership, the seller of the Properties, Appellants lacked standing to bring their TUFTA claims as pleaded against First Buyers, the 2015 purchasers of the Properties. *See id.*; *see also Midland Inv'rs*, 2016 Tex. App. LEXIS 4508, at *12-14. We overrule Appellants' eighth issue.

## II. TCPA Motion and Award of Attorney's Fees and Sanctions

### A. Knowing Participation Claim against First Buyers

Appellants also challenge the district court's order granting First Buyers' amended partial motion to dismiss under the TCPA. Appellants contend that the TCPA is inapplicable to a claim of "knowing participation/aiding and abetting breach of fiduciary duty" in

a private transaction and further, that they presented clear-and-specific evidence supporting that claim. Relatedly, they contend that the district court abused its discretion by awarding TCPA attorney's fees without evaluating whether the fees were "reasonably necessary" and by awarding TCPA sanctions that were "excessive and impermissibly punitive." We address these issues in turn.

## B. TCPA Framework and Standard of Review

The TCPA was designed to protect both a defendant's rights of speech, petition, and association and a claimant's right to pursue valid legal claims for injuries caused by the defendant. *Montelongo v. Abrea*, 622 S.W.3d 290, 295 (Tex. 2021); *SPS Austin, Inc. v. Wilbourn*, No. 03-20-00054-CV, 2021 Tex. App. LEXIS 9408, at *2 (Tex. App.—Austin Nov. 19, 2021, no pet.) (mem. op.); *see* Tex. Civ. Prac. & Rem. Code § 27.002.[8] "The Legislature has instructed that the TCPA 'shall be construed liberally to effectuate its purpose and intent fully.'" *ExxonMobil Pipeline Co. v. Coleman*, 512 S.W.3d 895, 898 (Tex. 2017) (quoting Tex. Civ. Prac. & Rem. Code § 27.011(b)). In furthering its purpose, the TCPA establishes a three-step process to evaluate whether a legal action should be dismissed for

---

[8] Section 27.002 describing the TCPA's purpose was unchanged in 2019, but other portions were extensively amended. *See* Act of May 21, 2011 82d Leg., R.S., ch. 341, 2011 Tex. Gen. Laws 961, *amended by* Act of May 22, 2013, 83d Leg., R.S., ch. 1042, 2013 Tex. Gen. Laws 2499 (affecting in relevant part Tex. Civ. Prac. & Rem. Code § 27.004), *amended by* Act of May 17, 2019, 86th Leg., R.S., ch. 378, 2019 Tex. Gen. Laws 684, 684-687 (in relevant part amending Tex. Civ. Prac. & Rem. Code §§ 27.001(2), .003(a), .005(b) & (d), .006(a), .009(a)). Because this suit was filed on April 6, 2018, the pre-amendment version of the TCPA applies. *See* Act of May 17, 2019, 86th Leg., R.S., ch. 378, §§ 11-12, 2019 Tex. Gen. Laws at 687 (specifying that amendments to TCPA apply "only to an action filed on or after" September 1, 2019). We will refer to relevant, applicable provisions of the TCPA that were amended in 2019 as "former Tex. Civ. Prac. & Rem. Code § 27. . . ."

improper infringement of protected rights.  *See Montelongo*, 622 S.W.3d at 295-96; *Wilbourn*, 2021 Tex. App. LEXIS 9408, at *2.

First, a party seeking dismissal bears the burden of showing by a preponderance of the evidence that the non-movant's legal action is based on, relates to, or is in response to a party's exercise of the right of free speech, right to petition, or right of association.  Former Tex. Civ. Prac. & Rem. Code §§ 27.003(a), .005(b); *Montelongo*, 622 S.W.3d at 296; *Wilbourn*, 2021 Tex. App. LEXIS 9408, at *3.  If the movant meets that burden, the trial court must dismiss the action unless the non-movant establishes by clear and specific evidence a prima facie case for each element of its claim.  Former Tex. Civ. Prac. & Rem. Code § 27.005(b), (c); *In re Lipsky*, 460 S.W.3d 579, 586 (Tex. 2015) (orig. proceeding); *Wilbourn*, 2021 Tex. App. LEXIS 9408, at *3.  Finally, even if the non-movant satisfies its burden of establishing a prima facie case, the court "shall dismiss a legal action against the moving party if the moving party establishes by a preponderance of the evidence each essential element of a valid defense to the nonmovant's claim."  Former Tex. Civ. Prac. & Rem. Code § 27.005(d); *Coleman*, 512 S.W.3d at 898.  In determining whether the TCPA applies and whether to dismiss the case, the trial court considers "the pleadings and supporting and opposing affidavits stating the facts on which the liability or defense is based."  Former Tex. Civ. Prac. & Rem. Code § 27.006(a); *In re Lipsky*, 460 S.W.3d at 587; *Wilbourn*, 2021 Tex. App. LEXIS 9408, at *2-3.

A "prima facie case" refers to evidence that is "sufficient as a matter of law to establish a given fact if it is not rebutted or contradicted."  *Landry's, Inc. v. Animal Legal Def. Fund*, 631 S.W.3d 40, 54 (Tex. 2021).  "It is the 'minimum quantum of evidence necessary to support a rational inference that the allegation of fact is true.'"  *Id.*  The claimant must submit evidence of facts to make the prima facie case.  *Montelongo*, 622 S.W.3d at 301; *see* Tex. Civ.

Prac. & Rem. Code § 27.005(c); *Wilbourn*, 2021 Tex. App. LEXIS 9408, at *4. Evidence of a prima facie case must be clear and specific to avoid dismissal, meaning that a "plaintiff must provide enough detail to show the factual basis for its claim." *Landry's*, 631 S.W.3d at 54 (quoting *Bedford v. Spassoff*, 520 S.W.3d 901, 904 (Tex. 2017)); *see* Tex. Civ. Prac. & Rem. Code § 27.005(c).

Here, Appellants dispute whether First Buyers met their burden of showing the TCPA's applicability, and First Buyers dispute whether Appellants met their burden of establishing a prima facie case. We review de novo whether the TCPA movant established by a preponderance of the evidence that the legal action is subject to the TCPA and whether the non-movant presented clear and specific evidence establishing a prima facie case for each essential element of its challenged claims. *See Serafine v. Blunt*, 466 S.W.3d 352, 357 (Tex. App.—Austin 2015, no pet.); *Wilbourn*, 2021 Tex. App. LEXIS 9408, at *4-5.

### C. Applicability of TCPA

Under the first step of the TCPA process, First Buyers had the burden to show that Appellees' claim of "knowing participation/aiding and abetting breach of fiduciary duty" was within the scope of the TCPA. Appellants contend that the TCPA is inapplicable to "a purely private business transaction" in which First Buyers "had divergent interests from a party on the opposite side of a transaction." We conclude that First Buyers met their burden of showing that the TCPA applies.

First Buyers' amended partial motion to dismiss under the TCPA asserted that Appellants' legal action against them was based on, related to, or in response to First Buyers' exercise of their right of association. *See* Former Tex. Civ. Prac. & Rem. Code § 27.003(a).

23

"The phrase 'based on, relates to, or is in response to' dictates the nexus that must exist between the 'legal action' and the protected conduct under the TCPA." *Grant v. Pivot Tech. Sols., Inc.*, 556 S.W.3d 865, 879 (Tex. App.—Austin 2018, pet. denied). At a minimum, the phrase encompasses a "legal action" that is factually predicated on the alleged conduct that falls within the scope of the TCPA's definition of the exercise of the right of free speech, petition, or association. *Id.*

Exercise of the right of association is defined in the TCPA as "a communication between individuals who join together to collectively express, promote, pursue, or defend common interests." *See* Former Tex. Civ. Prac. & Rem. Code § 27.001(2); *In re Lipsky*, 460 S.W.3d at 586 n.6. "Communication," in turn, is defined in the TCPA as including "the making or submitting of a statement or document in any form or medium, including oral, visual, written, audiovisual, or electronic." Tex. Civ. Prac. & Rem. Code § 27.001(1).

Although First Buyers deny the allegations of wrongdoing against them, they point to Appellants' pleadings as proof of "communication" under subsection 27.001(a) of the TCPA. *See id.* § 27.006 (stating that trial court may consider pleadings as proof in determining whether legal action is subject to or should be dismissed under TCPA). First Buyers note that these pleadings—which do not describe the parties as disinterested buyers and sellers in an arms-length transaction—allege communication of a scheme between First Buyers, their principals, and Schaffer to collectively pursue their common interest in sharing profits from the full value of the Properties through creation of a sham sale. The pleadings factually assert that Scott Schaeffer—as president of Original Partnership and a principal in one or more entities that controlled the general partner—"with the aid of" the First Buyers' principals, Howard P.

24

Treatman and John J. Curry, manufactured the complained-of sale through communications in which they expressly "discussed" the Properties:

- Schaeffer "contacted" two friends, Treatman and Curry, "to manufacture a drastically below market sale of the Properties, that would result in no money to [Original Partnership]";

- Schaeffer and General Partner [Lafayette English GP, LLC] "negotiated and agreed" to a lesser amount than First Buyers offered for the Properties;

- First Buyers "were aware" that their initial proposal was reduced to the lesser amount;

- First Buyers "knew" that Schaeffer and General Partner were not exercising their fiduciary duties because all of the interested parties (buyer, seller, and lender) shared Ledgewood counsel in negotiating the sale and "papering the transaction";

- Schaeffer, Treatman, and Curry have had a "long, ongoing relationship" and "[t]hrough various entities, the three have owned and/or managed several properties together over the last decade";

- "This symbiotic relationship continued with the fraudulent sale of the Properties herein";

- "Treatman confirmed to Schaeffer [in an email excerpt copied into the petition] that he and Curry were interested in looking at, among others, the Properties in Austin. How long Schaeffer, Treatman, and Curry discussed the Properties prior to January 22, 2015, is unknown";

- All participants in the sale of the Properties were "working in tandem" with counsel to transfer the Properties; and

- "Evidence clearly indicates that the sale was not an arms-length transaction."

When responding to First Buyers' TCPA motion to dismiss, Appellants confirmed their characterization of these communications: "[First Buyers]' 'negotiations' with their longtime business partner, and co-owner of several multifamily properties, do not amount to an arms' length transaction" and "almost no negotiations took place in the sale of [Original Partnership] to the [First Buyers], largely because these parties make millions together from their numerous shared properties each year."

25

As First Buyers note, negotiating and closing on the real property transaction necessarily required a "communication"—that is, "the making or submitting of a statement or document in any form or medium, including oral, visual, written, audiovisual, or electronic"—and First Buyers "could not have consummated the transaction without communicating among themselves and with Schaeffer and other defendants in some way." *See id.* Further, the affidavit of Howard Treatman, filed with the TCPA motion, avers that such communications occurred: "I, on behalf of [First Buyers] HVC English, LLC and HVC Lafayette, LLC, communicated with Scott Schaeffer and others in connection with the purchase and sale of the Properties in 2015."

The basis for Appellants' knowing participation claim, as alleged in their pleadings, is the oral and written communication among First Buyers, Schaeffer, and General Partner that occurred while they were collectively pursuing their common interest in sharing profits from the sale of the Properties. These communications implicate First Buyers' exercise of their right of association. *See* Former Tex. Civ. Prac. & Rem. Code § 27.001(1), (2); *In re Lipsky*, 460 S.W.3d at 586 n.6. They fall within the "wide net" of the TCPA. *See Adams v. Starside Custom Builders, LLC*, 547 S.W.3d 890, 894 (Tex. 2018) ("The TCPA casts a wide net."); *see also Lara v. Streamline Ins. Servs., LLC*, No. 03-19-00474-CV, 2020 Tex. App. LEXIS 10436, at *8-9 (Tex. App.—Austin Dec. 31, 2020, no pet.) (mem. op.) (concluding that TCPA applied to plaintiffs' claim of knowing participation in breach of fiduciary duty because it concerned communications in which defendants "allegedly joined together to collectively express, promote, pursue, or defend their common interests in developing business," implicating defendants' exercise of right of association); *Reeves v. Harbor Am. Cent., Inc.*, 631 S.W.3d 299, 303, 308 (Tex. App.—Houston [14th Dist.] 2020, pet. denied) (concluding that TCPA applied to breach-of-fiduciary-duty counterclaim that implicated employee's exercise of right of association

26

because it involved communications about his "endeavor with others . . . to collectively express, promote, pursue, or defend a common interest" in establishing competing business); *Grant*, 556 S.W.3d at 881 (concluding that TCPA applied to plaintiffs' breach-of-fiduciary-duty claim that concerned communications between defendants who joined together to pursue common interest in employment with company and retention of company's ability to operate as historically underutilized business, which implicated defendants' right of association); *Elite Auto Body, LLC v. Autocraft Bodywerks, Inc.*, 520 S.W.3d 191, 205 (Tex. App.—Austin 2017, pet. dism'd) (concluding that TCPA applied to breach-of-fiduciary-duty claim alleging communications between defendants to lure competitor's employees to their business and to share or use confidential information, implicating exercise of right of association).

### D. Inapplicability of Subsequent Amendments to TCPA

Seeking to exclude their claim of "knowing participation/aiding and abetting breach of fiduciary duty" from the TCPA, Appellants contend that the 2019 amendments to the statute "evidence the Legislature's intent that § 27.001(2) does not apply to this type of dispute." But we have rejected the argument that amendments to the TCPA control our construction of the prior law. *See Wilbourn*, 2021 Tex. App. LEXIS 9408, at *18-19. In *Wilbourn*, we noted that the TCPA amendments are inapplicable to cases filed before September 1, 2019:

> We look at the plain language of the applicable statute and give little weight to amendments in interpreting the prior law. *Pruett v. Harris Cnty. Bail Bond Bd.*, 249 S.W.3d 447, 454 (Tex. 2008). We are constrained to construe the statute as it existed, to apply the applicable law as written—not as it would later be written—absent the Legislature making the law retroactively applicable. *Hegar v. American Multi-Cinema, Inc.*, 605 S.W.3d 35, 44 (Tex. 2020).

*Id.* at *19. Appellants do not address *Wilbourn*.

27

Relying instead on two other decisions, *Grand Parkline, LLC v. Mama Fu's Lakeline, LLC*, No. 03-19-00683-CV, 2020 Tex. App. LEXIS 9358 (Tex. App.—Austin Dec. 2, 2020, no pet.) (mem. op.) and *Crossroads Cattle Co. v. AGEX Trading, LLC*, 607 S.W.3d 98 (Tex. App.—Austin 2020, no pet.), Appellants contend that we "expressly narrowed the definition of 'right of association' under the pre-2019 statute." We disagree. As an intermediate court of appeals, we may not "narrow" a TCPA definition. *See Cadena Comercial USA Corp. v. Texas Alcoholic Beverage Comm'n*, 518 S.W.3d 318, 337 (Tex. 2017) ("We reversed the court of appeals' judgment because it read language into the TCPA that narrowed its application."). When a statute defines its terms, we may not "construct a restated definition using alternative verbiage that adds or subtracts substantive requirements or limiting factors." *Texas Comm'n on Env't Quality v. Maverick County*, 642 S.W.3d 537, 541 (Tex. 2022).

Further, neither *Grand Parkline* nor *Crossroads Cattle* purport to change any of our prior decisions. *Cf. Lawson v. Keene*, No. 03-13-00498-CV, 2016 Tex. App. LEXIS 1812, at *13 (Tex. App.—Austin Feb. 23, 2016, pet. denied) (mem. op.) ("We may not overrule a prior panel opinion of this court absent an intervening change in the law by the Legislature or a higher court or by decision of this court sitting en banc." (quoting *Ayeni v. State*, 440 S.W.3d 707, 717 (Tex. App.—Austin 2013, no pet.) (Pemberton, J., concurring))). Both cases concluded that when two counterparties enter into a single arm's length transaction, they do not necessarily "join to collectively . . . pursue a common interest" within the meaning of the TCPA. *See Crossroads Cattle*, 607 S.W.3d at 105 (concluding that defendants did not "allegedly collectively pursue any ongoing or greater enterprise than one mere sale of cattle"); *Grand Parkline*, 2020 Tex. App. LEXIS 9358, at *14 (concluding that subsequent landlords were not alleged to "share[] any specific common interest with the prior landlords other than mere consummation of

28

the sales transaction"); *see also* Tex. Civ. Prac. & Rem. Code § 27.001(2). The pleadings in those cases are distinct from Appellants' pleadings here, which include assertions that "the sale was not an arms-length transaction"; that participants in the sale of the Properties were "working in tandem"; that Schaeffer, General Partner, and First Buyers had a "long, ongoing relationship" involving ownership or management of several properties together over the last decade; and that the sale of the Properties was a continuation of that "symbiotic relationship."

Having considered the pleadings and the affidavit in this record, we conclude that the TCPA applies to Appellants' claim of "knowing participation/aiding and abetting breach of fiduciary duty" based on the implication of First Buyers' right of association. *See* Former Tex. Civ. Prac. & Rem. Code § 27.006(a). Because First Buyers demonstrated that the TCPA applies, we consider next whether Appellants presented clear and specific evidence establishing a prima facie case for each essential element of their knowing participation claim against First Buyers. *See id.* § 27.005(c).

### E. Prima Facie Case for Knowing-Participation Claim

Under the second step of the TCPA process, Appellants had the burden to establish by clear and specific evidence a prima facie case for each element of their claim against First Buyers. At the outset, we note that Appellants pleaded their claim as "knowing participation/aiding and abetting breach of fiduciary duty." We have previously concluded that there is no common-law claim for "aiding and abetting" in Texas. *Hampton v. Equity Tr. Co.*, 607 S.W.3d 1, 5 (Tex. App.—Austin 2020, pet. denied) ("In the absence of recognition by the Supreme Court of Texas or the Legislature, we conclude that a common-law cause of action for aiding and abetting does not exist in Texas."); *Thibodeaux v. Starx Inv. Holdings, Inc.*,

29

No. 03-20-00613-CV, 2021 Tex. App. LEXIS 8576, at *38 n.8 (Tex. App.—Austin Oct. 22, 2021, pet. dism'd) (mem. op.).

However, the Texas Supreme Court has recognized a claim for knowing participation in a breach of fiduciary duty: "It is settled as the law of this State that where a third party knowingly participates in the breach of duty of a fiduciary, such third party becomes a joint tort-feasor with the fiduciary and is liable as such." *Kinzbach Tool Co. v. Corbett-Wallace Corp.*, 160 S.W.2d 509, 514 (Tex. 1942); *see Lara*, 2020 Tex. App. LEXIS 10436, at *20-21; *Darocy v. Abildtrup*, 345 S.W.3d 129, 137 (Tex. App.—Dallas 2011, no pet.); *Cox Tex. Newspapers, L.P. v. Wootten*, 59 S.W.3d 717, 720-21 (Tex. App.—Austin 2001, pet. denied). Establishing a claim of knowing participation in a breach of fiduciary duty requires showing that: (1) there was a fiduciary duty owed by a third party to the plaintiff; (2) the defendant knew of the fiduciary relationship; and (3) the defendant was aware of his participation in the third party's breach of its duty. *Darocy*, 345 S.W.3d at 138; *see Wootten*, 59 S.W.3d at 722 (applying *Kinzbach* to plaintiff's allegations). The parties dispute whether Appellants established by clear and specific evidence the second and third elements: that First Buyers knew of a fiduciary relationship between Schaeffer, General Partner, and Appellants, and that First Buyers were aware of their participation in Schaeffer's and General Partner's breach of their duties to Appellants. Appellants contend that First Buyers knew that Schaeffer and General Partner owed fiduciary duties to Appellants through "inferred" and "imputed" knowledge of the 2006 Original Partnership Agreement containing the fiduciary obligations and the Independent Manager requirement for sale of the Properties.

30

### 1. Inferred knowledge

First, relying on Treatman's deposition testimony, Appellants assert that First Buyers' knowledge of the fiduciary duties owed may be inferred from Treatman's request for and receipt of a CD in 2015 containing copies of the loan and acquisition documents concerning the prior conveyance of the Properties, including the 2006 Original Partnership Agreement. But Treatman confirmed in his deposition that: (1) he did not review the CD or read the organizational documents when they were sent; (2) he never had discussions with Schaeffer about the necessity of an Independent Manager to authorize any sale of Original Partnership's assets; and (3) if there were such a requirement, he was unaware of it. There is no evidence to the contrary.

The two authorities that Appellants cite for their inferred-knowledge argument do not support it. In *Graham Mortgage Corp. v. Hall*, there is no discussion of inferred knowledge because it was undisputed that the defendant—the mortgage lender for the sale of the real estate at issue—had actual knowledge of the terms of the parties' agreements. *See* 307 S.W.3d 472, 480 (Tex. App.—Dallas 2010, no pet.). In *McNeil Pacific Investors Fund 72, Ltd. v. Ernst & Young & BDO Seidman*, an unpublished and nonprecedential case, the court considered whether the statute of limitations barred claims and when a plaintiff is deemed to have constructive notice of his claims for purposes of the discovery rule. *See* No. 05-94-01527-CV, 1995 Tex. App. LEXIS 3551, at *15-16 (Tex. App.—Dallas July 28, 1995, writ denied) (not designated for publication).[9] These cases are not persuasive. *See In re Lipsky*, 460 S.W.3d at 590 (noting that

---

[9] *See* Tex. R. App. P. 47.7 (providing that opinions designated "do not publish" by courts of appeals before January 1, 2003 "have no precedential value but may be cited with the notation, '(not designated for publication)'").

31

"pleadings that might suffice in a case that does not implicate the TCPA may not be sufficient to satisfy the TCPA's 'clear and specific evidence' requirement").

There is no basis for Appellants' suggested inference besides the excerpt of Treatman's testimony. Any inference from Treatman's testimony that the documents were reviewed around the time that they were sent to him vanishes given his testimony that the documents were not reviewed. *See In re Certain Underwriters at Lloyd's London*, 294 S.W.3d 891, 907 (Tex. App.—Beaumont 2009, orig. proceeding) ("While evidence that documents are sent creates an inference that the documents were reviewed around that time, that inference vanishes when opposing evidence is introduced to show that the document was not reviewed."). "An inference is not rational 'if premised on mere suspicion—some suspicion linked to other suspicion produces only more suspicion, which is not the same as some evidence.'" *Neurodiagnostic Consultants, Ltd. Liab. Co. v. Villalobos*, No. 03-18-00743-CV, 2019 Tex. App. LEXIS 8875, at *13 (Tex. App.—Austin Oct. 4, 2019, no pet.) (mem. op.) (quoting *Suarez v. City of Texas City*, 465 S.W.3d 623, 634 (Tex. 2015)).

Appellants say that circumstantial evidence supports their suggested inference of First Buyers' actual knowledge of the fiduciary duties owed. "But for circumstantial evidence to establish any material fact, including knowledge or intent, there must be 'a logical bridge between the proffered evidence and the necessary act.'" *Porter-Garcia v. Travis Law Firm, P.C.*, 564 S.W.3d 75, 89 (Tex. App.—Houston [1st Dist.] 2018, pet. denied) (quoting *IKON Office Sols., Inc. v. Eifert*, 125 S.W.3d 113, 124 (Tex. App.—Houston [14th Dist.] 2003, pet. denied)); *see KPH Consolidation, Inc. v. Romero*, 102 S.W.3d 135, 145 (Tex. App.—Houston [14th Dist.] 2003), *aff'd sub nom. Romero v. KPH Consol., Inc.*, 166 S.W.3d 212 (Tex. 2005) ("The material fact must be reasonably inferred from the known circumstances."). Here, no

logical bridge connects the proffered evidence—Treatman's testimony that he did not read the documents—to the necessary act—First Buyers' knowledge from the documents of a fiduciary duty owed to Appellants. Thus, we cannot conclude that Appellants presented any clear and specific evidence to support a rational inference that First Buyers had actual knowledge of a fiduciary relationship among Schaeffer, General Partner, and Appellants.

## 2. Imputed knowledge

Alternatively, Appellants contend that knowledge of a fiduciary relationship between Schaeffer, General Partner, and Appellants is imputed to First Buyers based on the knowledge of their attorneys at Ledgewood, who represented First Buyers and the General Partner in the 2015 Sale and provided the documents on the CD to Treatman. Appellants' cited authorities do not support this proposition. *See, e.g.*, *American Flood Rsch., Inc. v. Jones*, 192 S.W.3d 581, 584 (Tex. 2006) (upholding trial court's imposition of sanctions, although there was "no direct evidence that the employees knew of the [ordered] depositions and deliberately failed to attend," because their attorney's knowledge of court order compelling depositions was imputed to them); *Cohen v. Hawkins*, No. 14-07-00043-CV, 2008 Tex. App. LEXIS 2647, at *19-20 (Tex. App.—Houston [14th Dist.] Apr. 15, 2008, pet. denied) (mem. op.) (concluding that purchaser of property knew that seller did not own it because seller's power of attorney, which *both* purchaser and his attorney reviewed, did not show seller as property owner); *Lehrer v. Zwernemann*, 14 S.W.3d 775, 778 (Tex. App.—Houston [1st Dist.] 2000, pet. denied) (concluding that plaintiff was "on notice" of defendant mediator's professional relationship with opposing counsel because *both* plaintiff and his attorney knew before mediation that defendant had acted as mediator for opposing counsel in past). None of Appellants' cited cases stand for

33

the proposition that automatically imputed knowledge suffices as clear and specific evidence to support a plaintiff's claim of knowing participation when the defendant lacks actual knowledge.

Imputed knowledge in the agency context is based on a presumption. *See Holmes v. Uvalde Nat. Bank*, 222 S.W. 640, 642 (Tex. App.—San Antonio 1920, writ ref'd) (noting that doctrine of imputed knowledge rests on presumption concerning agent's communication of knowledge to principal). A true presumption is "a rule of law laid down by the courts which attaches to facts certain procedural consequences." *Combined Am. Ins. Co. v. Blanton*, 353 S.W.2d 847, 849 (Tex. 1962). A presumption is not evidence. *See id.* (noting that "presumption is not evidence and is not to be weighed or treated as evidence"); David A. Schlueter & Jonathan D. Schlueter, *Texas Rules of Evidence Manual*, § 301.01[2] (10th ed. 2015).

Moreover, the imputed-knowledge doctrine is not automatically applied in all circumstances and has been expressly rejected when, as here, an attorney represented parties on both sides of transaction. *See Hazlewood Patterson Co. v. Hancock*, No. 10-03-00274-CV, 2004 Tex. App. LEXIS 11314, at *8 (Tex. App.—Waco Dec. 15, 2004, pet. denied) (mem. op.); *see also GXG, Inc. v. Texacal Oil & Gas*, 977 S.W.2d 403, 410 (Tex. App.—Corpus Christi–Edinburg 1998, pet. denied) (concluding that where agent represented both purchaser and seller, agent's knowledge was not "automatically imputed" to seller). The necessity of actual knowledge for a claim of "aiding and abetting" breach of fiduciary duty was discussed in a decision involving a suit against a law firm, its owner attorney, and a second attorney from the same firm. *See First United Pentecostal Church of Beaumont v. Parker*, 514 S.W.3d 214, 225 (Tex. 2017). The plaintiff alleged that the owner attorney stole from them and that the second attorney from the firm "knowingly" participated in that breach of fiduciary duty. *Id.* But the

34

Texas Supreme Court noted that there was no evidence that the second attorney was aware beforehand of the owner attorney's plans or actions and affirmed summary judgment for the second attorney. *Id.*

Consistent with this authority, we have stated that "[a] cause of action premised on contribution to a breach of a fiduciary duty . . . must involve the knowing participation in such a breach." *Wootten*, 59 S.W.3d at 722; *see Kinzbach*, 160 S.W.2d at 514. Accordingly, "imputed knowledge is insufficient to find knowing participation in a breach of fiduciary duty." *DeYoung v. Beirne, Maynard & Parsons, L.L.P.*, No. 01-13-00365-CV, 2014 Tex. App. LEXIS 2965, at *16 (Tex. App.—Houston [1st Dist.] Mar. 18, 2014, no pet.) (mem. op.); *accord Rotstain v. Trustmark Nat'l Bank*, Civil Action No. 3:09-CV-2384-N, 2022 U.S. Dist. LEXIS 10332, at *43 (N.D. Tex. 2022) (noting that for claims of knowing participation, "[c]ourts have made clear that a less culpable mental state, such as constructive knowledge, will not suffice"); *Franklin D. Azar & Assocs., P.C. v. Bryant*, No. 4:17-cv-00418-ALM-KPJ, 2019 U.S. Dist. LEXIS 147393, at *9 (E.D. Tex. 2019) (concluding that knowing participation claim under Texas law requires actual knowledge, not constructive knowledge).

Texas law does not support the assertion that automatically imputing Ledgewood's knowledge of the contents of the 2006 Original Partnership Agreement to First Buyers suffices as clear and specific evidence to support a rational inference that First Buyers had actual knowledge of a fiduciary relationship among Schaeffer, General Partner, and Appellants. Without this element, Appellants could not show a claim of knowing participation in a breach of fiduciary duty and the prima facie case fails. Thus, we need not reach Appellants' contention as to the third element of a knowing participation claim, whether First Buyers were

35

aware of their alleged participation in Schaeffer's and General Partner's breach of their duties to Appellants.

In sum, because First Buyers met their burden of showing that Appellants' claim of knowing participation in a breach of fiduciary duty had the requisite connection to the exercise of the right of association and because Appellants failed to meet their burden of establishing by clear and specific evidence a prima facie case for each element of their knowing participation claim, the TCPA required dismissal of it. *See* Former Tex. Civ. Prac. & Rem. Code § 27.005(b), (c). We proceed to consider the requisite awards of attorney's fees and sanctions.

### F. TCPA Attorney's Fees Award to First Buyers

Under the applicable version of the TCPA, the trial court is required to award attorney's fees to a successful movant and may award sanctions to deter the party who brought the suit from bringing similar actions. Former Tex. Civ. Prac. & Rem. Code § 27.009(a). In support of the attorneys' fees recoverable under the TCPA, an attorney for First Buyers filed an affidavit. After granting the TCPA motion to dismiss, the district court signed a separate order awarding First Buyers attorney's fees of $50,651.82 and sanctions of $50,203.00.

Regarding the attorney's fee award, Appellants complain that the district court "rubber stamped" First Buyers' fee request, that it "clearly did not consider" the issues that Appellants "identified" below, and that its "failure to apply any substantive reduction in the light of serious issues raised with specificity requires reversal." However, Appellants provide no citation to the record to support these complaints and no discussion about how their alleged "issues" with the award of attorney's fees apply to the evidence that First Buyers filed.

The Rules of Appellate Procedure require the appellant's brief to present "clear and concise argument for the contentions made, with appropriate citations to . . . the record." Tex. R. App. P. 38.1(i). When, as here, a party fails to properly cite to the record and omits meaningful argument, appellate courts may consider the issue waived due to inadequate briefing. *See Fredonia State Bank v. General Am. Life Ins. Co.*, 881 S.W.2d 279, 283-85 (Tex. 1994); *Canton-Carter v. Baylor Coll. of Med.*, 271 S.W.3d 928, 931 (Tex. App.—Houston [14th Dist.] 2008) (noting that failure to "provide substantive analysis of the legal issues presented results in waiver of the complaint"); *see also Adams v. Adams*, No. 01-17-00305-CV, 2018 Tex. App. LEXIS 6675, at *2 (Tex. App.—Houston [1st Dist.] Aug. 23, 2018, no pet.) (mem. op.) (concluding that party's challenge to sufficiency of evidence supporting award of attorney's fees was waived due to inadequate briefing). We conclude that Appellants' failure to properly brief their attorney's fees issue waives the complaint. *See* Tex. R. App. P. 38.1(i).

### G. TCPA Sanctions Award to First Buyers

Next, Appellants complain that the $50,203 sanctions award is "excessive" and thereby violates due process, and that there is "no evidence in the record to suggest that future actions would be filed by" them.[10] In their reply brief, Appellants further complain that the sanctions award was not supported by any finding as to First Buyers' contention that the award "matches the amount of fees" and "reflects the economic impact of [Appellant]s' claims."

We apply an abuse-of-discretion standard in reviewing a trial court's award of sanctions under the TCPA. *Landry's*, 631 S.W.3d at 46; *Low v. Henry*, 221 S.W.3d 609, 612 (Tex. 2007); *see* Former Tex. Civ. Prac. & Rem. Code § 27.009(a). "A trial court abuses its

---

[10] Appellants acknowledge that the district court awarded First Buyers $50,203 in sanctions, which is slightly less than the $50,230 that First Buyers requested.

discretion by 'act[ing] without reference to guiding rules and principles to such an extent that its ruling was arbitrary or unreasonable.'" *Landry's*, 631 S.W.3d at 46 (quoting *Nath v. Texas Child.'s Hosp.*, 446 S.W.3d 355, 361 (Tex. 2014)).

The applicable version of the TCPA requires an award of sanctions against the party who brought an action that was dismissed under the TCPA:

> (a) If the court orders dismissal of a legal action under this chapter, the court shall award to the moving party:
>
> . . . .
>
> (2) sanctions against the party who brought the legal action *as the court determines sufficient* to deter the party who brought the legal action from bringing similar actions described in this chapter.

Former Tex. Civ. Prac. & Rem. Code § 27.009(a)(2) (emphasis added). "[T]he statute does not specify a particular formula, amount, or guideline for determining the sanctions amount other than to say that the amount is to be sufficient to deter the party who brought the legal action from bringing similar actions." *Tatum v. Hersh*, 559 S.W.3d 581, 587 (Tex. App.—Dallas 2018, no pet.) (op. on remand). Thus, the TCPA "gives the trial court broad discretion to determine what amount is sufficient to deter the party from bringing similar actions in the future." *Kinney v. BCG Att'y Search, Inc.*, No. 03-12-00579-CV, 2014 Tex. App. LEXIS 3998, at *35 (Tex. App.—Austin Apr. 11, 2014, pet. denied) (mem. op. on reh'g).

Here, the district court's order stated that Appellants were ordered to pay to First Buyers "sanctions sufficient to deter [Appellants] from bringing similar actions in the amount of $50,203.00." Appellants suggest that findings explaining this sanctions award were necessary, complaining that "[t]here are no findings or other indications of the trial court's rationale."

Additionally, they state that our recent decision in *Serafine v. Blunt*, No. 03-20-00294-CV, 2021 Tex. App. LEXIS 9386 (Tex. App.—Austin Nov. 19, 2021, pet. denied) (mem. op.), "is directly on point and contradicts Appellees' argument" as to the propriety of the award.

We disagree on both counts. First, we have recognized that the TCPA "does not expressly require the trial court to explain how it reached its determination."[11] *Kinney*, 2014 Tex. App. LEXIS 3998, at *35. Second, in *Serafine*, we concluded that the specific findings that the trial court had entered in that case were at odds with its sanctions award: "Because the trial court found that the Blunts were not likely to file further actions that would implicate the TCPA" and further, "because it determined that an attorneys' fee award to Serafine would have a deterrent effect, we conclude that the trial court acted without reference to guiding rules and principles by imposing more than a nominal amount of sanctions." *Id.* at *22-23. Our holding hinged on those specific trial-court findings. *Id.* at 21-23 (prefacing our determinations by noting "[i]t is evident from the trial court's own findings," "[i]n light of its own findings," and "[i]n light of the trial court's own findings"). By contrast, this record presents no such conflict between any findings entered and sanctions awarded. Thus, *Serafine* does not "contradict" First

---

[11] The only circumstance in which the applicable version of the TCPA requires trial-court findings is when the party moving for dismissal requests them. *See* Tex. Civ. Prac. & Rem. Code § 27.007(a) (requiring certain findings "[a]t the request of a party making a motion [to dismiss] under Section 27.003"). If that request is made, the trial court "shall issue findings regarding whether the legal action was brought to deter or prevent the moving party from exercising constitutional rights and is brought for an improper purpose, including to harass or to cause unnecessary delay or to increase the cost of litigation." *Id.*; *see Greer v. Abraham*, 489 S.W.3d 440, 443 n.3 (Tex. 2016) (noting that "[t]his finding is the only one expressly required by the TCPA if requested by the party seeking dismissal" and that "[t]he Act does not otherwise expressly address findings of fact and conclusions of law, but neither does it forbid them") (citing Tex. Civ. Prac. & Rem. Code § 27.007(a)). Here, First Buyers, as movants seeking dismissal under the TCPA, did not request entry of such findings.

Buyers' argument that this sanctions award "matches the amount of fees" and "reflects the economic impact of [Appellant]s' claims."

Our sister court considered the propriety of the amount of a TCPA sanctions award by using the amount of attorney's fees awarded in that case as a guide: "[W]e rely on two case-specific guideposts that are objectively quantifiable: we know the amount of the [defendants]' reasonable attorneys' fees, costs, and expenses, and we know that the number of similar actions [plaintiff] has filed is zero." *Landry's, Inc. v. Animal Legal Def. Fund*, 566 S.W.3d 41, 73 (Tex. App.—Houston [14th Dist.] 2018), *aff'd in part, rev'd in part on other grounds*, 631 S.W.3d 40 (Tex. 2021). Ultimately, the court concluded that the amount of the sanctions award should not have exceeded the amount of the attorney's fees award:

> [W]e do not review the award de novo. Because we review the sanctions award only for abuse of discretion, it is not for this court to determine anew what an appropriate sanction would be. We hold only that, on this record, the trial court lacked discretion to award an amount that is larger than the only monetary guidepost in evidence.

*Id.* The court then suggested "remittitur to reduce the sanctions to an amount equal to the attorneys' fees awarded." *Id.* at 73-74.

Similarly, the district court could have reasonably determined that the $50,203.00 award of TCPA sanctions to First Buyers—which is less than but nearly equal to the award of TCPA attorney's fees—was both within the permissible ratio referenced in *Landry's* and was "sufficient to deter [Appellants] from bringing similar actions." *See id.* at 73. Additionally, when entering this order the district court could have considered the history of the litigation since the suit's filing more than a year earlier, including its prior orders dismissing Appellants' TUFTA claims and knowing participation claims against First Buyers for lack of merit, as well

as Appellants' unsuccessful request that the district court instead sanction First Buyers for filing a motion to dismiss that was "frivolous" and "filed solely for undue delay" under subsection 27.009(b) of the TCPA. *See Stromberger v. Turley Law Firm*, 315 S.W.3d 921, 924 (Tex. App.—Dallas 2010, no pet.) (considering party's conduct during litigation when awarding sanctions). On this record, Appellants have not demonstrated that in awarding TCPA sanctions of $50,203.00 to First Buyers, the district court acted "without reference to guiding rules and principles" such that its ruling was "arbitrary or unreasonable." *See Landry's*, 631 S.W.3d at 46. Thus, no abuse of the district court's discretion is shown.

After reviewing Appellants' issues concerning the TCPA-related orders in favor of First Buyers, we conclude that:

- Appellants' claim of knowing participation in a breach of fiduciary duty is subject to the TCPA;

- Appellants did not present clear and specific evidence establishing a prima facie case for each essential element of their knowing-participation claim;

- Appellants' issue challenging the award of attorney's fees is waived; and

- Appellants did not show that the sanctions award was an abuse of the district court's discretion.

Accordingly, we overrule Appellants' fifth, sixth, and seventh issues.

### III. Cross-Motions for Summary Judgment

The last set of issues in this appeal concern challenges to the order on the parties' cross-motions for summary judgment and the objections to certain summary-judgment evidence. As mentioned, the district court granted Appellees' motions, denied Appellants' motions, and overruled all of the evidentiary objections. Appellants contend that the district court erred by:

(1) dismissing "sua sponte" some of their claims against General Partner, Subsidiary General Partner, and Schaeffer (GP Appellees); (2) overruling their objections to certain summary-judgment evidence; (3) granting GP Appellees' summary judgment on Appellants' breach-of-contract claim; (4) granting First Buyers' summary judgment on Appellants' declaratory-judgment claim; and (5) granting Second Buyers' summary judgment on Appellants' quiet-title claim. We address these contentions in turn.

### A. Dismissal "Sua Sponte" of Claims Against GP Appellees

As an initial matter, Appellants complain that the district court "sua sponte" dismissed certain claims that were unaddressed in the summary-judgment motion filed by GP Appellees (General Partner, Subsidiary General Partner, and Schaeffer). Appellants complain that the order granted summary judgment as to all claims against GP Appellees despite the summary-judgment motion's lack of reference to Appellants' claims for breach of fiduciary duty, fraud by nondisclosure, accounting, and one breach-of-contract theory. In that way, Appellants contend that the order granted greater relief than the summary-judgment motion requested and that those unaddressed claims should be remanded. We agree.

Summary judgments may only be granted on grounds expressly asserted in the summary-judgment motion. Tex. R. Civ. P. 166a(c) ("The motion for summary judgment shall state the specific grounds therefor."). "A trial court cannot grant summary judgment on grounds that were not presented." *Nall v. Plunkett*, 404 S.W.3d 552, 555 (Tex. 2013). "Granting a summary judgment on a claim not addressed in the summary judgment motion therefore is, as a general rule, reversible error." *Id.* (quoting *G & H Towing Co. v. Magee*, 347 S.W.3d 293, 297 (Tex. 2011)).

Here, Appellants' live pleading, their Third Amended Petition, alleges claims against GP Appellees for breach of contract, breach of fiduciary duty, fraud by nondisclosure and accounting. *See* Tex. Bus. Orgs. Code § 152.211(a)-(b) (allowing partner to maintain action for breach of partnership agreement or violation of duty to partnership and providing for enforcement of certain rights by "legal or equitable relief, including an accounting of partnership business"). Appellants also pleaded two breach-of-contract theories: the first based on the alleged necessity of an Independent Manager's consent to the sale of the Properties and the second based on the alleged sale of the Properties below market value that was not in the best interest of the Original Partnership. GP Appellees moved for summary judgment on one basis: the breach-of-contract theory concerning the alleged necessity of an Independent Manager.

Accordingly, we sustain the portion of Appellants' first issue challenging the summary judgment granted in favor of GP Appellees on Appellants' claims for breach of fiduciary duty, fraud by nondisclosure, accounting, and the second breach-of-contract theory alleging that the sale of the Properties was below market value and was not in the best interest of the Original Partnership. We proceed to consider only the breach-of-contract claim concerning the alleged necessity of an Independent Manager that was expressly addressed in GP Appellees' summary-judgment motion and in Appellants' "Second Amended Motion for Partial Summary Judgment."

### B. Breach-of-Contract Claim Against GP Appellees

In their cross-motions for summary judgment, the parties dispute whether GP Appellees breached certain sections of the 2006 Original Partnership Agreement requiring the consent of an Independent Manager for the sale of the Properties and consideration of the partnership's interests. Appellants contend that the 2015 Sale to First Buyers was void because

43

GP Appellees lacked authority to sell the Properties without the prior written consent of an Independent Manager.

We review grants of summary judgment de novo. *Lightning Oil Co. v. Anadarko E&P Onshore, LLC*, 520 S.W.3d 39, 45 (Tex. 2017). If a trial court does not specify the grounds it relied upon in making its determination, reviewing courts must affirm summary judgment if any of the grounds asserted are meritorious. *Id.* On cross-motions for summary judgment, each party bears the burden of establishing its entitlement to judgment as a matter of law. *Miles v. Texas Cent. R.R. & Infrastructure, Inc.*, 647 S.W.3d 613, 619 (Tex. 2022). When, as here, the trial court grants one motion and denies the other, we "determine all questions presented" and "render the judgment that the trial court should have rendered." *Id.* (quoting *City of Garland v. Dallas Morning News*, 22 S.W.3d 351, 356 (Tex. 2000)).

A plaintiff asserting a breach-of-contract claim must prove that: (1) a valid contract exists; (2) the plaintiff performed or tendered performance as the contract required; (3) the defendant breached the contract by failing to perform or tender performance as the contract required; and (4) the plaintiff sustained damages as a result of the breach. *USAA Tex. Lloyds Co. v. Menchaca*, 545 S.W.3d 479, 502 (Tex. 2018). The breach element is the focus of these parties' summary-judgment motions.

### 1. Parties' Grounds for Summary Judgment

GP Appellees moved for summary judgment on multiple grounds, including that there was no breach because consent of an Independent Manager was not required under the terms of the 2006 Original Partnership Agreement. Specifically, GP Appellees contend that under subsection 9(c)(v) of the 2006 Original Partnership Agreement, consent of an Independent Manager for a sale of the Properties was required only "[s]o long as any Obligation is

44

outstanding." GP Appellees argue that such consent was not necessary or appropriate because the outstanding loan obligation was being repaid in full by the sale of the Properties, thereby having no impact on the rights of the lender.

Appellants moved for summary judgment alleging that GP Appellees breached subsection 9(c)(iii) of the 2006 Original Partnership Agreement requiring an Independent Manager's consent for the sale of the Properties and section 11 of the 2006 Original Partnership Agreement requiring that, "so long as any obligation remains outstanding," the General Partner must consider the Original Partnership's interests when acting or voting on a matter requiring the General Partner's approval.

We turn to the provisions of the 2006 Original Partnership Agreement that these summary-judgment motions invoked.

### 2. Independent-Manager Provisions

The general partner is vested with broad powers in the 2006 Original Partnership Agreement—unaltered in the amended 2009 Original Partnership Agreement—as set forth in subsections 9(a) and (b):

Section 9. <u>Management and Control</u>.

(a) Except as provided herein, the management of the Partnership shall be vested exclusively in the General Partner. Except as provided herein, the Limited Partner shall have no part in the operation or management of the Partnership and shall have no authority or right to act on behalf of or to bind the Partnership in connection with any matter.

(b) Subject to Section 9(c) of this Agreement, the General Partner and the Officers shall have the exclusive right, power and authority on behalf of and in the name of the Partnership to carry out any and all acts necessary, convenient or incidental to or for the furtherance of the purposes described herein, including without limitation, all powers, statutory or otherwise, possessed by officers of a limited partnership and a general partner of a limited partnership formed under the laws

45

of the State of Texas. The Limited Partner agrees that all determinations, decisions and actions made or taken by the General Partner and the Officers shall be conclusive and absolutely binding upon the Partnership, the Limited Partner and its successors and assigns.

The next subsection of the 2006 Original Partnership Agreement, 9(c), sets forth certain limitations on the partnership's activities that are directed at qualifying the Original Partnership as a "special purpose entity." Special-purpose entities are used to protect lenders by isolating financial assets from the potential bankruptcy estate of the borrower. *See Basic Cap. Mgmt., Inc. v. Dynex Com., Inc.*, 348 S.W.3d 894, 896 n.4 (Tex. 2011) (citing *In re Gen. Growth Props., Inc.*, 409 B.R. 43, 49 n. 15 (Bankr. S.D.N.Y. 2009)); *see also In re Pacific Lumber Co.*, 584 F.3d 229, 250 (5th Cir. 2009) ("Special purpose entities are often used in securitized lending because they are bankruptcy-remote, that is, they decrease the likelihood that the originator's financial trouble will affect the special purpose entity's assets serving as collateral for the notes."). Consistent with its special-purpose-entity design, subsection 9(c)(iii) contains "Independent Manager" provisions as part of the Original Partnership's management structure and requires an Independent Manager's approval for "Material Action[s]":

(c) <u>Limitations on the Partnership's Activities.</u>

   (i)    This <u>Section 9(c)</u> is being adopted in order to comply with certain provisions required in order to qualify the Partnership as a "special purpose" entity.[12]

---

[12] A "special purpose entity" is defined in Schedule A, attached to the 2006 Original Partnership Agreement:

<u>"Special Purpose Entity"</u> means a Person (other than a natural person) whose organizational documents contain restrictions on its purpose and activities and impose requirements to preserve its separateness that are substantially similar to the Special Purpose Provisions of this Agreement or General Partner Agreement, as applicable.

. . . .

(iii)    Notwithstanding any other provision of this Agreement and any provision of law that otherwise so empowers the Partnership, the General Partner, the Officers or any other Person, neither the Partnership nor the General Partner nor any Officer nor any other Person shall be authorized or empowered, nor shall they permit the Company, without the prior written consent of the General Partner (which consent shall, pursuant to the General Partner Agreement, require the prior unanimous written consent of the Members (as such term is defined in the General Partner Agreement), Manager and the Independent Manager of the General Partner) to take any Material Action; provided however, that pursuant to the General Partner Agreement, the General Partner may not authorize the taking of any Material Action, unless there is at least one Independent Manager serving in such capacity.[13]

---

[13]  An "Independent Manager" is defined in Schedule A:

"Independent Manager" means a natural person who, for the five-year period prior to his or her appointment as Independent Manager of the General Partner has not been, and during the continuation of his or her service as Independent Manager is not and will not be: (i) an employee, director, attorney, counsel, trustee, member, stockholder, partner or officer of the Partnership, General Partner or any of either of their Affiliates (other than his or her service as an Independent Manager of the General Partner); (ii) a creditor, customer or supplier of the Partnership, the General Partner or either of their Affiliates; (iii) any member of the immediate family of a person described in (i) or (ii); or (iv) a Person Controlling or under common Control with any Person excluded from serving as Independent Manager under (i) or (ii).  A natural person who satisfies the foregoing definition other than subparagraph (ii) shall not be disqualified from serving as an Independent Manager of the General Partner if such individual is an Independent Manager provided by a nationally-recognized company that provides professional Independent Managers (a "Professional Independent Manager") and other corporate services in the ordinary course of its business.  A natural person who otherwise satisfies the foregoing definition other than subparagraph (i) by reason of being an independent director of a Special Purpose Entity affiliated with the General Partner or the Partnership shall not be disqualified from serving as an Independent Manager of the General Partner if such individual is either (i) a Professional Independent Manager or (ii) the fees that such individual earns from serving as independent director of Affiliate of the General Partner constitute in the aggregate less than five percent (5%) of such individual's annual income.

A "Material Action," for which an Independent Manager's consent is required, is defined in the 2006 Original Partnership Agreement as including the sale of "all or substantially all of the assets of the Company [Original Partnership]."[14] Additionally, subsection 9(c)(v)(A) of the 2006 Original Partnership Agreement states that if there is an outstanding "Obligation," the general partner shall not allow the partnership to sell its assets:

> (v) *So long as any Obligation is outstanding*, the General Partner shall not cause or permit the Partnership to:
>
> (A) *sell*, assign, pledge, encumber or otherwise transfer or dispose of *all or any portion of its assets* (including, without limitation, the Property) *without the prior written consent of Lender* (except pursuant to the Basic Documents); any attempt to transfer or encumber any assets owned by the Partnership to the extent not expressly permitted hereunder shall be void and of no force or effect, to the fullest extent permitted by law[.]

(Emphasis added.) "Obligations," in turn, are defined in the 2006 Original Partnership Agreement to include "the indebtedness, liabilities and obligations of the Partnership under or in connection with this Agreement."

Finally, section 11 of the 2006 Original Partnership Agreement states that the general partner will "cause the General Partner agreement to provide that . . . the General Partner

---

[14] "Material Action" means to consolidate or merge the Partnership with or into any Person, or sell all or substantially all of the assets of the Company, or to institute proceedings to have the Partnership be adjudicated bankrupt or insolvent, or consent to the institution of bankruptcy or insolvency proceedings against the Partnership or file a petition seeking, or consent to, reorganization or relief with respect to the Partnership under any applicable federal or state law relating to bankruptcy, or consent to the appointment of a receiver, liquidator, assignee, trustee, sequestrator (or other similar official) of the Partnership or a substantial part of its property, or make any assignment for the benefit of creditors of the Partnership, or admit in writing the Partnership's inability to pay its debts generally as they become due, or take action in furtherance of any such action, or, to the fullest extent permitted by law, dissolve or liquidate the Partnership.

shall *at times* have at least one (1) Independent Manager." (Emphasis added.) At the time the Properties were sold in 2015, there was not an appointed Independent Manager. But if an Independent Manager had been appointed at that time, and if "any Obligation remain[ed] outstanding," section 11 would have required the Independent Manager to "consider only the interest of the Partnership . . . in acting or otherwise voting on" a Material Action, such as the sale of the Properties:

> Section 11. <u>General Partner: Independent Managers</u>.
>
> *So long as any Obligation remains outstanding*, the Partnership shall have only one General Partner which, to the fullest extent permitted by law, shall *consider only the interests of the Partnership*, including, if the Partnership is insolvent, the Partnership's creditors*, in acting or otherwise voting on the matter for which its approval is required hereunder*. The General Partner hereby agrees, to the fullest extent permitted by law, to cause the General Partner Agreement to provide that (i) any Independent Manager may not be removed until a successor Independent Manager shall have (A) accepted his or her appointment as an Independent Manager by a written instrument, and (B) executed a counterpart to the General Partner Agreement as required thereby, (ii) to the fullest extent permitted by law, including Section 18-1101(c) of the Delaware Limited Liability Company Act, the Independent Managers shall consider only the interest of the Partnership, including its respective creditors, in acting or otherwise voting on the matter referred in Section 9(c)(iii) of the General Partner Agreement, and (iii) the General Partner shall at times have at least one (1) Independent Manager.

(Emphasis added.)

### 3. Independent Manager Not Required for Sale That Satisfied Original Partnership's Outstanding Obligation

Considering these provisions collectively and assuming, as Appellants do, that the Independent Manager provision carried forward after Original Partnership's 2009 reorganization, we conclude that an Independent Manager's consent would have been unnecessary for the 2015 sale of the Properties. The Independent Manager provision—expressly included as part of the

partnership's special-purpose-entity design in section 9(c) of the 2006 Original Partnership Agreement—sought to prevent actions encumbering the collateral for the outstanding loan. *See, e.g.*, J. Bradley Boericke, et. al., *Independent Manager Provisions Ineffective to Preclude Bankruptcy Filing by Supposedly "Bankruptcy-Remote" Entities*, 64 Consumer Fin. L.Q. Rep. 45, 46 (2010) (noting that objective of independent-manager requirements "is to reduce the possibility that creditors or investors who have extended credit to the SPE [special purpose entity] will be caught up in a bankruptcy, which would preclude the timely enforcement of their remedies against the SPE or its assets, and to insulate the SPE from the risk of having its assets 'substantively consolidated' with those of an insolvent affiliate"). Upon repayment of the loan, the property owner had authority to dispose of the property without an Independent Manager.

The GP Appellees' summary-judgment motion noted that the 2009 reorganization "placed the lender [RAIT] in control of both the general partner and the limited partner of the entity which held record title to the properties" and contended that "once the loan was repaid, the owner of the property had absolute authority to dispose of the property as it saw fit." GP Appellees' motion quoted Reyle's deposition testimony explaining that subsection 9(c)(v) and section 11 were operative only "so long as any obligation remain[ed] outstanding":

> Q.  And *as in section 9(c)(v)* that we already looked at, *the requirements of section 11* only operate, quote, *so long as any obligation remains outstanding*, correct?
>
> A.  That's the lead-in phrase of the paragraph, yes.
>
> Q.· All right.· And why is that the lead-in phrase of the paragraph[?]
>
> A.  As I explained earlier, so that—you know, take a step back.  Our—a lender's requirements are extremely onerous.· They're onerous to comply with from an operational perspective.· They're expensive, Independent Managers, have to basically you'd be—be hired from a third—third-party agency because they have

50

to be unaffiliated with everyone associated with the transaction.· They're not things that borrowers typically would do on their own, or, in my experience, ever do on their own.· They don't want to be a single-purpose entity.· They don't want to have a portfolio that they're amassing and have 200 entities that they have to manage because their lenders are requiring them to have a different entity own the property every single time.· The lenders require it, and that's the deal, so they have to do it.

. . . .

Q.· Again, tell the jury why the existence of an Independent Manager—is it tied to a loan being outstanding?

A.· It is, yes.

Q.· Well, why?

A.· Why?· To—to protect the creditors of the ultimate borrower, which is controlled through the—the general partner, from the various equity members doing things that are adverse to the interests of the creditors.· You know, most—most prominently, it's filing bankruptcy.

Q.· And if a loan isn't outstanding, this agreement no longer requires an Independent Manager, correct?

A.· Correct, and there would be no need for one.

Q.· Because there would be no lender to protect if no loan was outstanding.

A.· Correct.

. . . .

Q.· In your experience, if a loan is being repaid in full, does the Independent Manager have any ability or authority to block a sale otherwise authorized by general partner?

A.  No, it does not.

Q.· What was the final sale price for the two apartment complexes in 2015, Mr. Reyle?

A.· 18,786,000.

Q.· What was the outstanding loan balance?

51

A.· 18,786,000.25.

(Emphasis added.)

Thus, under the express terms of subsection 9(c) and section 11 of the 2006 Original Partnership Agreement, because the Original Partnership's outstanding loan obligation was being fully repaid with the sale of the Properties, the General Partner was not limited to considering only the interests of the Partnership in acting on that sale, an Independent Manager would have been unable to block that action by the General Partner, and an Independent Manager's consent to the sale would have been unnecessary.[15]

On this record, GP Appellees have conclusively disproved Appellants' allegations that GP Appellees breached subsection 9(c)(iii) of the 2006 Original Partnership Agreement requiring an Independent Manager's consent for the sale of the Properties and section 11 of the 2006 Original Partnership Agreement requiring that, "so long as any obligation remains outstanding," the General Partner must consider the Original Partnership's interests when acting or voting on a matter requiring the General Partner's approval. For this reason, we conclude that the district court did not err by denying Appellants' summary-judgment motion and granting GP Appellees' summary-judgment motion on Appellants' first breach-of-contract theory. Thus, we

---

[15] Additionally, an Independent Manager's consent would have been unnecessary for the 2015 sale of the Properties because that transaction was made with the "prior written consent of Lender," thereby complying with subsection 9(c)(v)(A) of the 2006 Original Partnership Agreement. As quoted above, this provision states that "[s]o long as any Obligation is outstanding, the General Partner shall not cause or permit the Partnership to: sell, assign, pledge, encumber or otherwise transfer or dispose of all or any portion of its assets (including, without limitation, the Property) without the prior written consent of Lender." Here, the lender RAIT, acting through the General Partner, signed the agreement to sell the Properties and signed the special warranty deeds for the Properties to the First Buyers. Thus, the 2015 Sale was valid because of RAIT's "prior written consent" to it.

overrule the portion of Appellants' first issue challenging the summary judgment as to their breach-of-contract claim concerning the alleged necessity of an Independent Manager.[16]

### C. Declaratory-Judgment Claim Against First Buyers and Quiet-Title Claim Against Second Buyers

Finally, our conclusion that GP Appellees' sale of the Properties to First Buyers in 2015 was not void necessarily resolves the remaining appellate issues, which challenge the summary judgments as to Appellants' declaratory-judgment claim against First Buyers[17] and Appellants' quiet-title claim against Second Buyers.[18] On this record, Appellants were not entitled, as a matter of law, to their requested declarations against First Buyers as to the "void" sale of the Properties in 2015.[19] Nor were Appellants entitled, as a matter of law, to clear the

---

[16] Appellants' fourth issue contends that the district court abused its discretion by admitting evidence of an unsigned, unauthenticated operating agreement and accepting testimony from a corporate representative who lacked personal knowledge of that operating agreement. We need not reach this issue as we have not considered the alleged wrongly admitted evidence in upholding the district court's summary judgment on Appellants' breach-of-contract claim against GP Appellees concerning the need for an Independent Manager. *See* Tex. R. App. P. 47.1.

[17] When First Buyers moved for summary judgment as to Appellants' declaratory-judgment claim, it was the only remaining claim against them. As discussed, the district court granted First Buyers' plea to the jurisdiction dismissing Appellants' TUFTA claims and later granted First Buyers' amended partial motion to dismiss under the TCPA as to Appellants' "knowing participation/aiding and abetting breach of fiduciary duty" claim.

[18] This was Appellants' only claim against Second Buyers.

[19] Appellants requested declarations stating that:

1. (A) in order to authorize the sale of the Properties to the HVC Defendants, an Independent Manager was required to approve the sale of the Properties because such action was a "material action" pursuant to §9(c)(iii) of the TAO Agreement; (B) absent such approval, TAO and GP Defendant were without authority to enter into the APS, Loan Assumption, and any attendant agreements related thereto; and (C) absent such

cloud from their purported title by having Second Buyers' special warranty deed to the Properties "declared void and removed from the title records," as requested in their quiet-title claim against Second Buyers. Thus, we overrule Appellants' second and third issues challenging the summary judgments on those claims granted in favor of First Buyers and Second Buyers.

## CONCLUSION

We affirm in part the district court's May 4, 2021 final judgment as to these subsumed orders:

(1) the February 12, 2019 "Order Sustaining Defendants HVC English, LLC's and HVC Lafayette, LLC's Plea to the Jurisdiction";

(2) the June 24, 2019 "Order Granting Defendants HVC English, LLC's and HVC Lafayette, LLC's Amended Partial Motion to Dismiss Pursuant to Chapter 27 of the Texas Civil Practice and Remedies Code";

(3) the July 31, 2019 "Subsequent Order on Attorney's Fees, Costs, Other Expenses and Sanctions Awarded to Defendants HVC English, LLC and HVC Lafayette, LLC Pursuant to Chapter 27 of the Texas Civil Practice and Remedies Code"; and

---

authority, the APL, Loan Assumption, and any attendant documents related thereto are void, and/or void ab initio.

2. (A) the Partnership and GP Defendant were obligated not to authorize, empower, or permit a "material action" absent the approval of an Independent Manager pursuant to §9(c)(iii) and §9(c)(v); (B) that the sale of the Properties was a "material action" pursuant to §9(c)(iii) of the TAO Agreement requiring the approval of an Independent Manager; (C) absent such approval the Partnership and GP Defendant were without authority to enter into the APS, Loan Assumption, and any attendant agreements related thereto pursuant to §9(c)(v)(A); and (D) absent such authority, the APL, Loan Assumption, and any attendant documents related thereto are void and/or void ab initio.

3. [N]o authority existed to enter into the APS, Loan Assumption, and any attendant agreements related thereto, including any attempts to pass title from TAO to the HVC Defendants, are void, void ab initio, incapable of ratification, and of no legal effect.

(4) the portion of the December 16, 2020 Order denying "Plaintiff's Second Amended Motion for Partial Summary Judgment"; granting "HVC Defendants' [HVC English, LLC and HVC Lafayette, LLC's] . . . Cross-Motion for Summary Judgment"; granting the "Motion for Summary Judgment of Defendants Austin Lafayette Landing Realty LLC and Austin CMA English Aire Realty LLC"; and granting "Defendants Lafayette English Apartments, LP, Lafayette English GP, LLC and Scott Schaeffer's Motion for Summary Judgment" on Appellants' breach-of-contract claim alleging the necessity of an Independent Manager.

We reverse in part the district court's May 4, 2021 final judgment as to the December 16, 2020 Order granting "Defendants Lafayette English Apartments, LP, Lafayette English GP, LLC, and Scott Schaeffer's Motion for Summary Judgment" on Appellants' claims for: (1) breach of fiduciary duty; (2) fraud by nondisclosure, (3) accounting; and (4) breach-of-contract alleging that the sale of the Properties was below market value and was not in the best interest of the Original Partnership, and we remand those claims to the district court for further proceedings consistent with this opinion.

_____

Gisela D. Triana, Justice

Before Justices Goodwin, Baker, and Triana

Affirmed in Part and Reversed and Remanded in Part

Filed:  September 30, 2022

55